[No. 18053-1-III. Division Three. December 2, 1999.]

MICHELLE SNYDER, *Appellant*, v. MEDICAL SERVICE CORPORATION OF EASTERN WASHINGTON, *Respondent*.

*William J. Powell* of *Powell & Morris, P.S.*, for appellant. *Keller W. Allen* of *McCormick Dunn & Black, P.S.*, for respondent.

SWEENEY, J. — We are presented with several questions in this wrongful discharge case. First, does the rude, boorish, overbearing behavior of a supervisor that results in emotional distress to an employee give rise to a cause of action, unprotected by the immunity afforded employers by the Washington Industrial Insurance Act (RCW 51.04)? It does. Second, does this conduct support a claim for emotional distress where the employer has no reason to know of the employee's susceptibility to emotional problems? It does not. Third, was the conduct here so out of bounds, so abusive as to constitute a claim of constructive discharge? Even if it were, Washington is a terminable-at-will state and the constructive termination here was not for a prohibited reason. *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996). Finally, if a supervisor is rude and overbearing and an employee sustains emotional injuries as a result, must the employer accommodate the employee's request for a new supervisor under the Law Against Discrimination (RCW 49.60)? The employer need not. We affirm the trial court's summary dismissal of Ms. Snyder's complaint.

## FACTS

Michelle Snyder worked for Medical Service Corporation of Eastern Washington (MSC) as a social work case manager in the Care Management Department. Celeste Hall supervised the Care Management Department. Ms. Hall was intimidating, threatening, belligerent, and abusive to employees. Some employees quit, citing Ms. Hall as the reason.

Ms. Snyder frequently discussed her salary with Ms. Hall. On May 1, 1996, Ms. Snyder received a $166 per month pay raise because the responsibilities of her position increased. Ms. Hall threatened to discipline Ms. Snyder if she raised the salary issue again.

But on July 2, 1996, Ms. Snyder evaluated Ms. Hall as "wonderful" and a supervisor whose attitude was not "out of line." Ms. Hall noted that she was "extremely satisfied" with Ms. Snyder's work on January 31, 1997. She rated Ms. Snyder's overall performance as "very good."

Ms. Hall told Ms. Snyder that she would receive a $393 per month raise on February 1, 1997. She told Ms. Snyder that she was doing a good job. According to Ms. Snyder, Ms. Hall leaned into her and said, "If you ever tell anybody within MSC anywhere that you got this raise, I will literally hunt you down and kill you." Ms. Snyder was intimidated by, and scared of, Ms. Hall.

During a subsequent meeting, Ms. Hall asked all department employees to work one Saturday without additional pay. Several employees, including Ms. Snyder, did not want to work the additional day because of personal commitments. Ms. Snyder has custody of her children every other weekend. She also worked a second job on weekends when she did not have her children. Ms. Hall responded that it was inappropriate for Ms. Snyder to mention the child care issue. She then mockingly asked everyone who had children to raise their hands. Ms. Snyder left the meeting.

Ms. Hall met with Ms. Snyder after the meeting. Ms. Snyder explained that she understood Ms. Hall expected her to miss either a Saturday with her children or income from her second job. Ms. Hall "snapped." She walked toward Ms. Snyder, poked her in the chest, and declared, "I will not tolerate insubordinance from you." Ms. Hall then walked out.

Ms. Snyder did not feel any physical pain or effects from Ms. Hall's poking. MSC supervisors may not use physical force or threats of physical force. But Ms. Snyder did not inform Ms. Hall's supervisors of the incident.

By early February 1997, Ms. Snyder had applied for three other positions with MSC. MSC did not hire her for any of the positions.

On February 13, Ms. Snyder took two weeks off on the advice of her physician. On February 26, Ms. Snyder's physician informed MSC that she should be off work for two more weeks due to anxiety.

On March 11, Ms. Snyder met with Ms. Hall's supervisor, Dr. Norman Charney, and reported that she suffered from posttraumatic stress disorder (PTSD). Ms. Snyder has struggled with depression her entire life. She was first diagnosed with PTSD in 1987 or 1988. She has also taken antidepressants since 1988 and received regular psychological counseling since 1986. This was MSC's first notice of Ms. Snyder's emotional problems.

Ms. Snyder refused to return to work under Ms. Hall's supervision. Dr. Charney told Ms. Snyder that he wanted her to return to MSC, but that she would report to Ms. Hall.

On April 10, another company offered Ms. Snyder full-time employment if her physician released her for work. Her physician released her to work in any position and without restriction. But Ms. Snyder's physician did not release her to return to work under Ms. Hall's supervision.

Ms. Snyder left MSC because she could not work with Ms. Hall.

She then sued MSC for infliction of emotional distress (both intentional and negligent), constructive discharge, and handicap discrimination. She based the claims on Ms. Hall's "continuing harassment," her "rude, discourteous, disruptive, threatening, intimidating and coercing" conduct between April 1996 and February 1997, and MSC's failure to do anything about it.

The trial court granted MSC's motion for summary judgment.

## DISCUSSION

**Standard of Review.** Review of a summary judgment

is de novo. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). We look for a genuine issue of material fact. In doing so, we consider the evidence and the reasonable inferences therefrom in a light most favorable to Ms. Snyder. *Id.* And we will affirm the dismissal of a complaint if the facts do not support a cause of action. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996).

■ Employer Immunity. We begin by noting Ms. Snyder's claim is not barred by Washington's Industrial Insurance Act, which precludes civil suits by workers for injuries or occupational diseases incurred in the course of employment. *McCarthy v. Department of Soc. & Health Servs.*, 110 Wn.2d 812, 815-16, 759 P.2d 351 (1988). The claim is not based on an injury as defined by the Act (a sudden and tangible happening of a traumatic nature). RCW 51.08.100; *Wheeler v. Catholic Archdiocese*, 65 Wn. App. 552, 566, 829 P.2d 196 (1992), *rev'd on other grounds*, 124 Wn.2d 634, 880 P.2d 29 (1994). Neither is it an occupational injury. WAC 296-14-300 (claims based on mental conditions or mental disabilities caused by stress, including stress caused by conflicts or relationships with supervisors, fall outside the definition of an occupational disease).

■ Outrage. The tort of outrage, also known as intentional infliction of emotional distress, requires: " '(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress.' " *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995) (quoting *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987)); RESTATEMENT (SECOND) OF TORTS § 46 (1965). The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Dombrosky v. Farmers Ins. Co.*, 84 Wn. App. 245, 261, 928 P.2d 1127 (1996) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291, 77 A.L.R.3D 436 (1975)).

■ ■ This tort " 'does not extend to mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Grimsby*, 85 Wn.2d at 59 (quoting RESTATE-MENT, *supra*). "[I]t is not enough that a 'defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.' " *Id.* (quoting RESTATEMENT, *supra*). This is because all of us "must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Id.*

We first decide if reasonable minds could differ on whether the conduct here was sufficiently extreme to warrant submission to the jury. *Birklid*, 127 Wn.2d at 867; *Dombrosky*, 84 Wn. App. at 261. We consider

1. the position occupied by the defendant;

2. whether the plaintiff was particularly susceptible to emotional distress, and if the defendant knew this fact;

3. whether defendant's conduct may have been privileged under the circumstances;

4. whether the degree of emotional distress caused by a party was severe as opposed to mere annoyance, inconvenience, or normal embarrassment; and

5. whether the actor was aware that there was a high probability that his or her conduct would cause severe emotional distress and proceeded in a conscious disregard of it.

*Birklid*, 127 Wn.2d at 867.

Ms. Hall insulted, threatened, annoyed, showed unkindness, and acted with a callous lack of consideration. But this is not enough. *Grimsby*, 85 Wn.2d at 59. We hold that the level of incivility demonstrated here does not reach a level to support a claim of outrage. Further, no one at MSC, including Ms. Hall, knew that Ms. Snyder was susceptible to emotional injury. *Birklid*, 127 Wn.2d at 867. Ms. Snyder has not, therefore, made out a case for outrage or intentional infliction of emotional distress.

Negligent Infliction of Emotional Distress. To prove this cause of action, Ms. Snyder must show (1) that her employer's negligent acts injured her, (2) the acts were not a workplace dispute or employee discipline, (3) the injury is not covered by the Industrial Insurance Act, and (4) the dominant feature of the negligence claim was the emotional injury. *Chea v. Men's Wearhouse, Inc.*, 85 Wn. App. 405, 412-13, 932 P.2d 1261 (1997), *review denied*, 134 Wn.2d 1002 (1998).

■ Like all negligence claims, a negligent infliction of emotional distress claim requires duty, breach, proximate cause, and injury. *Hunsley v. Giard*, 87 Wn.2d 424, 434-35, 553 P.2d 1096 (1976). Emotional distress is "a fact of life" and so the elements of duty, breach, causation, and injury place limits on an employer's liability for emotional distress. *Id.* at 435; *Bishop v. State*, 77 Wn. App. 228, 233, 889 P.2d 959 (1995). In other words, a defendant's liability is measured "by the strictures imposed by negligence theory, i.e., foreseeable risk, threatened danger, and unreasonable conduct measured in light of the danger." *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 962, 577 P.2d 580 (1978). Ms. Snyder must also show objective symptoms of emotional distress. *Id.*; *Whaley v. State*, 90 Wn. App. 658, 673, 956 P.2d 1100 (1998).

Ms. Snyder argues that she does not have to show objective symptoms prior to when she began her medical leave. She contends her emotional distress must only be susceptible to medical diagnosis and proved through medical evidence. She relies on *Hegel v. McMahon*, 136 Wn.2d 122, 132-35, 960 P.2d 424 (1998). *Hegel* is distinguishable. The *Hegel* court's holding was in the context of a negligent infliction of emotional distress claim where the plaintiffs, relatives of an injured motorist, arrived shortly after the injury-causing accident. We recently reaffirmed the necessity of objective symptoms. *Whaley*, 90 Wn. App. at 673.

■ The mental distress must also "be the reaction of a normally constituted person," absent knowledge by the defendant that the plaintiff has a peculiar characteristic or

condition. *Hunsley*, 87 Wn.2d at 436. These claims are subject to further limits where the suit derives from the employment setting:

> The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace. Therefore, we hold that absent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes.

*Bishop*, 77 Wn. App. at 234-35 (footnote omitted).

This is a workplace dispute. The workplace is not stress free. *Id.* at 234. Ms. Hall's conduct and actions, again while maybe rude, boorish, and mean-spirited, were in the workplace setting and in furtherance of legitimate work-related topics—pay and unpaid overtime work.

And the claim is against MSC. So Ms. Snyder must show that MSC knew of her susceptibility to emotional injury, as well as knew of, condoned, or ignored Ms. Hall's conduct. *Hunsley*, 87 Wn.2d at 436. She has not done that. Therefore, Ms. Snyder's emotional distress was certainly not foreseeable. *Id.*

Ms. Snyder relies on *Chea v. Men's Wearhouse, Inc. Chea* is also distinguishable. There, the defendant employer did not, and indeed could not, argue that the employee's emotional distress was the result of a discipline or workplace dispute. *Chea*, 85 Wn. App. at 413. The harassment was ethnically motivated discrimination, pure and simple. *Id.* at 408, 413.

Constructive Discharge. Ms. Snyder next contends she was constructively discharged. An employer constructively discharges an employee by deliberately making the employ-

ee's working conditions intolerable and thereby forcing the employee to resign. *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996). Here, even were we to assume a constructive discharge, the question is whether the discharge was for a legally prohibited reason. *Id.* at 850.

■ ■ Washington is a terminable-at-will state. *Cole v. Red Lion*, 92 Wn. App. 743, 750, 969 P.2d 481 (1998). So absent a prohibited reason, an employer may terminate an employee at will. *Riccobono v. Pierce County*, 92 Wn. App. 254, 263, 966 P.2d 327 (1998); *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 632-33, 700 P.2d 338 (1985). It does not make any difference whether the employer accomplishes that discharge directly or constructively.

MSC did not know of Ms. Snyder's emotional condition prior to her leave of absence. She cannot show a continuous pattern of "discriminatory" treatment. Ms. Hall was rude, obnoxious, and overbearing. But she did not discriminate; she was rude, obnoxious, and overbearing to all of those in her charge. Clerk's Papers at 34, 54. This was not, therefore, a discriminatory purpose, no matter what the vehicle for discharge—express or constructive. *Sneed*, 80 Wn. App. at 850.

Handicap Discrimination. Ms. Snyder next contends that MSC failed to accommodate her handicap. Washington prohibits discrimination on the basis of sensory, mental, or physical handicap. RCW 49.60.010, .180. The Law Against Discrimination (RCW 49.60) is liberally construed. RCW 49.60.020; *Phillips v. City of Seattle*, 111 Wn.2d 903, 908, 766 P.2d 1099 (1989).

To establish a claim, Ms. Snyder must prove that (1) she is handicapped, (2) she was qualified to fill vacant positions, and (3) MSC failed to reasonably accommodate her disability by taking affirmative measures to make known such job opportunities to her and to determine whether she was in fact qualified for those positions. *Dean v. Municipality of Metro. Seattle*, 104 Wn.2d 627, 639, 708 P.2d 393

(1985). The parties focus on the reasonable accommodation element.[1]

■ An employer must reasonably accommodate the sensory, mental, or physical limitations of a disabled employee unless the employer can demonstrate an undue hardship would result to the employer's business. *Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993); WAC 162-22-080. The duty to accommodate is limited to those steps reasonably necessary to enable the employee to perform his or her job. *Doe*, 121 Wn.2d at 18. This involves "removing sensory, mental or physical impediments to the employee's ability to perform his or her job." *Id.* at 21. The employer need not necessarily grant the employee's request. It need only reasonably accommodate the disability. *Id.* at 20. Failure to reasonably accommodate is discrimination. *Id.* at 16.

■ The employee must give the employer notice of her disability to trigger the employer's duty of reasonable accommodation. *Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995). The employee need not explain the full nature and extent of her limitations; she need only give notice of a disability requiring accommodation. *Id.*

---

[1] We question whether Ms. Snyder suffers from a handicap. *See* WAC 162-040 (handicap is a sensory, mental, or physical condition that is abnormal and a reason why the employee was discriminated against); *Christiano v. Spokane County Health Dist.*, 93 Wn. App. 90, 93-94, 969 P.2d 1078 (1998) (reviewing handicap discrimination claim by an employee who was diagnosed with anxiety and depression. This court noted that "[a]lthough the initial issue may appear to be whether Mrs. Christiano's claimed condition was a handicap, principles of judicial restraint" required the court to address the dispositive issue of reasonable accommodation); *see also Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 n.3 (3d Cir. 1998) (noting "we strongly suspect that a plaintiff who is unable to work with individuals who cause him 'prolonged and inordinate stress' " fails to meet the definition of disabled under the Americans with Disabilities Act); *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997) (holding that employee who suffered from severe depression and anxiety allegedly caused by a particular supervisor was not disabled under the Americans with Disabilities Act because employee asserted he could work outside of the particular supervisor's chain of command); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996) (holding that because employee suffering from stress disorders allegedly caused by her supervisor claimed she could do the same job for a different supervisor she is not disabled under the Americans with Disabilities Act).

Here, MSC's duty to accommodate did not arise until Ms. Snyder's meeting with Dr. Charney on March 11, 1997.

 Whether reasonable accommodation was made or whether the employee's requests placed an undue burden on the employer are generally questions of fact for the jury. *Phillips*, 111 Wn.2d at 910-11. Here, Ms. Snyder wants a different supervisor.

 Washington has not addressed whether an employee's request for a new supervisor or a position with a new supervisor, and the employer's refusal to accommodate such request, violates the Law Against Discrimination. We therefore consider relevant federal law. *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 118, 720 P.2d 793 (1986); *Xieng v. Peoples Nat'l Bank*, 63 Wn. App. 572, 578, 821 P.2d 520 (1991), *aff'd*, 120 Wn.2d 512, 844 P.2d 389 (1993).

No court requires an employer to accommodate an employee's request for a new supervisor. This is because "[n]ot every personal discomfort nor workplace embarrassment rises to the level of a recognized disability requiring accommodation under the law." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526-27 (7th Cir. 1996).

In *Weiler*, the court affirmed the summary dismissal of an employee's Americans with Disabilities Act (ADA) claim. Ms. Weiler suffered from depression and anxiety as a result of a meeting with her supervisor. She requested a different supervisor, but no other positions were available. Her employer extended short-term disability benefits to her. Even though the employer offered Ms. Weiler five different positions, she chose not to return. *Id.* at 522-23. She sued instead, arguing that her employer should have accommodated her request for a transfer to another supervisor or transferred her supervisor. *Id.* at 526. The court held that the employer did not have to honor the request because the ADA does not allow a court to establish the conditions of an employee's employment. *Id.*

Other federal circuits echo this sentiment. In *Gaul v. Lucent Technologies Inc.*, the court affirmed a summary

dismissal of an employee's ADA claim. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576 (3d Cir. 1998). Mr. Gaul suffered from stress as a result of his coworkers and supervisors. He requested a transfer away from these people. The court held that Mr. Gaul's proposed accommodation was unreasonable as a matter of law under the ADA. The court noted that Mr. Gaul's proposal imposed "extraordinary administrative burdens" on the employer. *Id.* at 581.

Mr. Gaul asked the court to establish his employment conditions. The intent of the ADA is to avoid interfering with personnel decisions.[2]

We agree with federal case law on this issue. Washington courts are likewise reluctant to structure the workplace. *See Bishop v. State*, 77 Wn. App. 228, 234-35, 889 P.2d 959 (1995). MSC did not violate Washington's Law Against Discrimination by refusing to accommodate Ms. Snyder's request for a new supervisor. RCW 49.60.180(3).

SCHULTHEIS, C.J., and KURTZ, J., concur.

Review granted at 140 Wn.2d 1028 (2000).

---

[2]*Gaul*, 134 F.3d at 581; *see Wernick v. Federal Reserve Bank*, 91 F.3d 379, 384-85 (2d Cir. 1996) (responding to employee's claim that employer failed to accommodate by not assigning her to a different supervisor, the court noted that Congress did not intend the ADA "to interfere with personnel decisions within an organizational hierarchy"); *Kolpas v. G.D. Searle & Co.*, 959 F. Supp. 525, 530 (N.D. Ill. 1997) ("[i]t is not a reasonable accommodation for an employer to have to transfer an employee to a position under another supervisor. That decision remains with the employer."); *Adams v. Alderson*, 723 F. Supp. 1531, 1532 (D.D.C. 1989) (holding that employee's proposal that he be distanced from the supervisor who allegedly caused his stress disorder was unreasonable because "[a]n agency is entitled to assign its personnel as the needs of its mission dictate").