IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JUNGHEE KIM SPICER and | ) | No. 36065-2-III |
| DAVID SPICER, wife and husband; | ) | |
| YAKIMA ARTS ACADEMY, a | ) | |
| Washington limited liability company, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| PAUL PATNODE, individually and on | ) | |
| behalf of the marital community, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Over the course of four months, Paul Patnode

regularly and repeatedly remote-started his Ford F-250 pickup, revved its engine, and

activated its alarm to scare Junghee Spicer's young piano students as they walked past his

truck on the way to their piano lessons. Mr. Patnode's purpose was to interfere with Ms.

Spicer's piano lesson business and to cause her severe distress. He failed in his first

objective, but accomplished the second. The trial court found in favor of Ms. Spicer on

her claim of outrage and awarded her $40,000.

No. 36065-2-III
*Spicer v. Patnode*

The primary question we answer is whether Mr. Patnode's conduct was sufficiently outrageous and extreme to sustain the trial court's award. Conduct that is done infrequently merely to annoy a person cannot form the basis of an outrage claim. But the same conduct, done frequently over a period of weeks or months with the intent to cause severe emotional distress to a person, can form the basis of an outrage claim. We hold that Mr. Patnode's conduct was sufficiently outrageous and extreme to present a question of fact. For this reason, we defer to the finder of fact and affirm.

FACTS[1]

*Background prior to purported tortious conduct*

Paul and Melissa Patnode live across Lyle Loop Road from Junghee and David Spicer. In 2009, Ms. Spicer began teaching private piano lessons in her home, mostly to children. That year, Mr. Spicer suffered a stroke. Three years later, he had to retire early. To supplement their income, Ms. Spicer increased the number of piano lessons she taught.

In February 2012, Mr. Patnode complained to the Spicers about Ms. Spicer's piano teaching business. Unable to resolve the problems, Mr. Patnode complained to Yakima

---

[1] Mr. Patnode challenges 16 of the trial court's findings of fact. Of these, 12 are quite nuanced and are unimportant to the issues on appeal. The remaining challenges, those to findings of fact 23, 32, 33, and 34, are specifically addressed below.

County. His complaints included increased traffic, damage to a sprinkler in his front yard, noise from car doors shutting and remotely locking, and headlights coming into his house.

The complaints prompted Yakima County to require the Spicers to obtain a conditional use permit for their business. On July 11, 2012, the Spicers obtained a minor home occupation permit from Yakima County. The permit authorized Ms. Spicer to teach piano lessons for up to five students per day. Lessons were permitted from 2:00 p.m. to 6:00 p.m., Monday through Friday, September through May. The permit required the Spicers to provide off-street parking for customers.

In August 2012, Yakima County issued a modified permit that authorized Ms. Spicer to provide lessons for two additional months per year and increase the number of students to six per day. The Spicers were still required to provide off-street parking for customers.

Throughout 2012, Mr. Patnode continued complaining to Yakima County about Ms. Spicer's business. His complaints included Ms. Spicer teaching instruments other than piano and teaching outside the authorized hours. In addition, he complained that parents dropped their children off and picked them up along the street. He believed that this violated the off-street parking requirement.

In December 2012, Mr. Patnode sued the Spicers and alleged that their piano business violated the restrictive covenants that applied to the neighborhood. In 2014, the Spicers prevailed on summary judgment. Mr. Patnode was ordered to pay more than $30,000 for the Spicers' attorney fees and costs.

In 2014, the city of Selah annexed the parties' neighborhood. Mr. Patnode began complaining to the city of Selah that Ms. Spicer continued to violate her modified permit. That year, the Spicers formed Yakima Arts Academy, LLC (YAA). Ms. Spicer, through YAA, continued to teach piano lessons, both in her house and also in a leased building in Yakima.

*Purported tortious conduct*

From around Thanksgiving 2015 to March 24, 2016, Mr. Patnode parked his Ford F-250 diesel pickup along the sidewalk next to the Spicers' residence where piano students entered the Spicers' home. Other vehicles belonging to Mr. Patnode or his household also parked along the Spicers' side of the street.

During this time, Mr. Patnode regularly and repeatedly remote-started his F-250 and set off its alarm when Ms. Spicer's students and their parents walked by the F-250. Ms. Spicer observed this conduct approximately 12 times. When Ms. Spicer observed

this conduct, it frightened her and her students.  Mr. Spicer observed this conduct about six times.

*Ms. Spicer's 2016 anti-harassment petition*

In 2016, Ms. Spicer petitioned for an anti-harassment order against Mr. Patnode. Based on evidence presented at the anti-harassment hearing, the court granted Ms. Spicer's request and entered an anti-harassment order.  The order prevented Mr. Patnode from parking vehicles on Ms. Spicer's side of the street and required him to disable the remote-start and alarm for his F-250.  Mr. Patnode complied with the order.

*This lawsuit*

*Partial grant of summary judgment for the Spicers*

In May 2016, the Spicers filed this lawsuit against Mr. Patnode.  They sought damages for intentional interference with their piano business and damages for intentional infliction of emotional distress.  Prior to trial, the Spicers moved for partial summary judgment.  The motion sought to preclude Mr. Patnode from disputing (1) his conduct had no legitimate or lawful purpose and (2) his conduct caused Ms. Spicer substantial emotional distress.  The Spicers contended that these issues had already been litigated and necessarily decided when they obtained the anti-harassment order in March 2016.  The trial court granted their motion.

5

*Trial*

At trial, Ms. Spicer testified that Mr. Patnode's conduct caused her severe emotional distress because she feared for her safety and the safety of her children and students. She explained that Mr. Patnode's remote-starting his truck scared her because she was concerned he would "go to the next step and actually physically harm somebody." Report of Proceedings at 131.

Ms. Spicer testified that Mr. Patnode caused her to suffer from anxiety and insomnia, and that she began taking anti-anxiety medication in 2013. At some point after Mr. Patnode began remote-starting his truck, Ms. Spicer began taking an additional anti-anxiety medication.

Two parents and one piano student testified about arriving for and leaving from piano lessons between Thanksgiving 2015 and March 24, 2016. They testified they observed Mr. Patnode's F-250 remotely starting, its engine revving, and its alarm activating on multiple occasions. One parent testified that this made her scared and concerned for her children's safety. One student testified that *every* time he had a piano lesson between those dates, he observed the F-250 remotely start, its engine rev loudly, and its alarm activate. The parents did not take their children out of piano lessons with Ms. Spicer, and the student who testified did not quit taking lessons from Ms. Spicer.

The trial court found that Mr. Patnode did not cause any loss of business to the

Spicers. The court, however, did find that Mr. Patnode's conduct was sufficiently

outrageous to constitute intentional infliction of emotional distress. The trial court further

found that Ms. Spicer, but not Mr. Spicer, had proved compensable damages.

The trial court entered the following findings of fact to which Mr. Patnode assigns

error:

> 23.    In 2016, Ms. Spicer filed a petition for an anti-harassment
> order against Mr. Patnode. The Court takes judicial notice that following a
> hearing, the Yakima County Superior Court orally concluded that Mr.
> Patnode was remotely starting his F-250 and setting off vehicle alarms and
> doing so on purpose repeatedly for the purpose of harassing the Spicers,
> making their lives more difficult. . . .[2]
>
>     . . . .
>
> 32.    Junghee Spicer suffered severe emotional distress as a result
> of Mr. Patnode parking vehicles on the street alongside the Spicers [sic]
> house from Thanksgiving 2015 to March 24, 2016, and regularly and
> repeatedly remote starting his F-250 pickup (which included revving the
> engine, lights turning on) and remotely setting off the vehicle alarm while it
> was parked on the street alongside the Spicers' house, where
> children/students and their parents were walking to and from lessons at the
> Spicers' residence.
>
> 33.    The conduct of Mr. Patnode described above was directed
> towards Ms. Spicer. Mr. Patnode sought to interfere with the Spicers'
> music business. Ms. Spicer was the direct recipient of Mr. Patnode's

---

[2] Mr. Patnode persuasively argues that the trial court erred by taking judicial notice of the previous court's oral ruling. *See State v. Hescock*, 98 Wn. App. 600, 606, 989 P.2d 1251 (1999). We give no weight to finding of fact 23. This does not impair the same findings contained in finding of fact 32, subject to those findings being supported by substantial evidence.

conduct even though she was not present for, and did not observe, all instances when Mr. Patnode remote-started his F-250 or remotely set off the vehicle alarm when students and/or parents were walking to or from piano lessons.

34.    Ms. Spicer was fearful for her safety and for the safety of her students. . . . Ms. Spicer suffered insomnia and anxiety as a result of Mr. Patnode's conduct.  Ms. Spicer began taking anti-anxiety medication in 2013.  At some time after the remote-start/alarm incidents described above, Ms. Spicer began to take one additional anti-anxiety medication.  At the time of trial Ms. Spicer was also taking a third anti-anxiety medication.

Clerk's Papers (CP) at 322-26.

In addition, the trial court entered the following conclusion of law, to which Mr.

Patnode also assigns error:

6.    Mr. Patnode's conduct . . . was outrageous conduct.  *Ms. Spicer was the object of Mr. Patnode's course of conduct.  Mr. Patnode's conduct was directed at Ms. Spicer through her piano students and their parents.  Mr. Patnode's object was to interfere with the teaching business and cause distress to Ms. Spicer.*  Mr. Patnode's conduct went beyond all possible bounds of decency, and was atrocious and utterly intolerable in a civilized society.  *Mr. Patnode's conduct was intentional, he knew it would cause or inflict Ms. Spicer with emotional distress, and his conduct in fact caused Ms. Spicer severe emotional distress.*

CP at 327-28 (emphasis added).

The trial court awarded Ms. Spicer $40,000 in damages.

Mr. Patnode timely appealed.  A panel of this court granted oral argument, which

occurred at Whitman College, in Walla Walla, Washington.

8

ANALYSIS

Mr. Patnode makes three arguments: (1) conduct that Ms. Spicer or her immediate family members did not observe cannot form the basis of Ms. Spicer's outrage claim, (2) his conduct does not rise to the level of extreme and outrageous conduct as a matter of law, and (3) substantial evidence does not support the trial court's finding that Ms. Spicer suffered severe emotional distress. We address the issues in the order argued by Mr. Patnode.

1.      EVIDENCE NOT DIRECTLY WITNESSED BY MS. SPICER

Mr. Patnode argues the trial court erred by considering evidence not directly witnessed by Ms. Spicer or her immediate family members. His argument implies that his conduct was directed at the young piano students.

When the outrageous conduct is directed at a third person, the plaintiff must be an immediate family member of the person who is the object of the defendant's action, and he must be present at the time of the conduct. *Grimsby v. Samson*, 85 Wn.2d 52, 60, 530 P.2d 291 (1975) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. *l* (AM. LAW INST. (1965)). This rule has no application here, where the outrageous conduct was directed at Ms. Spicer rather than at a third person.

9

Here, the trial court found:[3]

> Ms. Spicer was the object of Mr. Patnode's course of conduct. Mr.
> Patnode's conduct was directed at Ms. Spicer through her piano students
> and their parents. Mr. Patnode's object was to interfere with the teaching
> business and cause distress to Ms. Spicer.

CP at 327.

The above finding is well supported by the evidence. For years, Mr. Patnode sought to substantially prevent, Ms. Spicer from teaching piano lessons at her house. He began by acting within the legal process. He first complained to Ms. Spicer, later he complained to Yakima County, and still later he complained to the city of Selah. When these complaints failed, he brought a lawsuit to prevent Ms. Spicer from teaching piano lessons out of her house. He alleged that Ms. Spicer's piano lesson business violated the neighborhood's restrictive covenants. The Spicers had that lawsuit dismissed and were awarded their reasonable attorney fees.

Shortly after, Mr. Patnode began acting outside the legal process. Mr. Patnode began scaring Ms. Spicer's young piano students by remote-starting his F-250, revving its engine, and activating its alarm. The young students, walking by his truck, did nothing to

---

[3] This finding comes from the trial court's conclusion of law 6. To the extent a conclusion of law contains a finding of fact, an appellate court will treat it as a finding of fact. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 353, 172 P.3d 688 (2007).

warrant being scared. In fact, Mr. Patnode testified he did not remote-start his truck for the purpose of scaring the piano students or their parents. The trial court reasonably found that Mr. Patnode's conduct was not directed at the young piano students, but instead was directed through them to Ms. Spicer. Because Mr. Patnode's conduct was directed at Ms. Spicer, the trial court did not err by considering evidence not directly witnessed by Ms. Spicer.

2.   EXTREME AND OUTRAGEOUS CONDUCT

Mr. Patnode argues, as a matter of law, his conduct does not amount to extreme and outrageous conduct.

To constitute outrage, the conduct at issue "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 91, 419 P.3d 819 (2018) (internal quotation marks omitted) (quoting *Grimsby*, 85 Wn.2d at 59). "Consequently, the tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Kloepfel v. Bokor*, 149 Wn.2d

11

192, 196, 66 P.3d 630 (2003) (internal quotation marks omitted) (quoting *Grimsby*, 85 Wn.2d at 59).

In order to prevail on a claim of intentional infliction of emotional distress, the plaintiff must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of emotional distress. *Lyons v. U.S. Bank Nat'l Ass'n*, 181 Wn.2d 775, 792, 336 P.3d 1142 (2014). The claim is also known as the tort of outrage. *Id.* "Although the three elements are fact questions for the jury, th[e] first element of the test goes to the jury only after the court 'determine[s] if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.'" *Robel v. Roundup Corp.*, 148 Wn.2d 35, 51, 59 P.3d 611 (2002) (quoting *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989)).

We examine Washington[4] decisions to determine what type of conduct is sufficiently outrageous and extreme to impose liability on an actor. Mr. Patnode cites *Strong v. Terrell*, 147 Wn. App. 376, 195 P.3d 977 (2008) and *Snyder v. Medical Service Corporation of Eastern Washington*, 98 Wn. App. 315, 988 P.2d 1023 (1999), *aff'd*, 145

---

[4] Each party cites several cases from other jurisdictions in support of their arguments. As shown below, even Washington cases are inconsistent on what type of conduct is sufficiently egregious to constitute outrage. It is, therefore, unsurprising that the out-of-state cases discussed by the parties and the dissent are inconsistent and unhelpful.

Wn.2d 233, 35 P.3d 1158 (2001) for the proposition that inflicting emotional harm on another over a period of months is insufficient to meet the high standard of outrageousness. In both cases, the plaintiff employees were subject to demeaning and insulting verbal treatment by their supervisors over a period of months. *Strong*, 147 Wn. App. at 381; *Snyder*, 98 Wn. App. at 319. Both courts noted that liability for outrage does not extend to treatment akin to "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Snyder*, 98 Wn. App. at 321-22 (internal quotation marks omitted) (quoting *Grimsby*, 85 Wn.2d at 59); *accord Strong*, 147 Wn. App. at 386. The courts reviewed the supervisors' treatment of their respective employees, determined that the treatment did not rise above insults, threats, and trivialities, and concluded that no liability existed. *Strong*, 147 Wn. App. at 386-87; *Snyder*, 98 Wn. App. at 322.

Mr. Patnode next cites *Saldivar v. Momah*, 145 Wn. App. 365, 186 P.3d 1117 (2008) to further support the proposition that inflicting emotional harm on another over a period of months is insufficient to meet the high standard of outrage. In that case, a woman and her husband fabricated allegations of sexual abuse against a physician and filed a lawsuit against him alleging that he sexually abused her. *Id.* at 390. The trial court dismissed the plaintiffs' claims after they rested, finding that the sexual abuse claim was not credible and that the purported victim had lied on the stand. *Id.* at 383-84. The trial

13

court also found that the attorney for the plaintiffs filed "'irrelevant and salacious declarations . . . for the improper purpose of eliciting media/public attention, to harass and damage the reputation of Dr. Momah, and to . . . gain advantage in other litigation.'" *Id.* at 386. Due to plaintiffs' false claims and their attorney's actions, Dr. Momah lost his job, suffered a stroke, and was uninsurable and unemployable. *Id.* at 384. The trial court awarded Dr. Momah substantial damages on his outrage claim against the plaintiffs and their attorney. *Id.* at 385. The appellate court reversed and concluded that the conduct was insufficient to constitute outrage. *Id.* at 390.

We contrast *Saldivar* with *Phillips v. Hardwick*, 29 Wn. App. 382, 628 P.2d 506 (1981). There, the Phillips agreed to purchase the Hardwicks' house and entered into an earnest money agreement. *Id.* at 384. The Hardwicks later learned that their new house would not be ready until shortly after the agreed closing date of November 25. *Id.* The Phillips agreed to rent the house to the Hardwicks until December 1. *Id.* The Hardwicks did not vacate as agreed. *Id.* On December 2, the Hardwicks told the Phillips that because they were tenants, the Phillips were powerless to remove them. *Id.* The Phillips drove by the house on December 3. *Id.* They looked inside, noticed the furniture was gone, and arranged to move in the following day. *Id.* The next day, when they arrived with a carload of furniture, the Hardwicks initially prevented them from moving in. *Id.*

When the Phillips returned with a second carload, they noticed two deputy sheriffs. *Id.* at 384-85. The deputies determined that the Phillips had the right of possession and advised the Hardwicks of this, yet the Hardwicks refused to leave. *Id.* at 385. The next day, the Phillips commenced two lawsuits. *Id.* The first lawsuit was an unlawful detainer, and the second lawsuit sought damages on various theories, including intentional infliction of emotional distress. *Id.* The Hardwicks moved out a few days later and gave the keys to the Phillips. *Id.* In the second lawsuit, the trial court found in favor of the Phillips and awarded them over $11,000. *Id.* at 383. On appeal, the trial court affirmed the damages award on the basis that reasonable minds could differ as to whether the Hardwicks' conduct was sufficiently outrageous. *Id.* at 388-89.

We cannot reconcile *Saldivar* with *Phillips*. *Saldivar* involved extreme conduct that caused extensive emotional and financial damages. Yet, the appellate court reversed the trial court's finding of outrage. *Phillips* involved a few days' delay in occupancy that caused a mere annoyance to a home purchaser. Yet, the appellate court affirmed the trial court's finding of outrage. We disagree with both decisions.

We find support for our disagreement in *Wolf v. Scott Wetzel Servs., Inc.*, 113 Wn.2d 665, 782 P.2d 203 (1989), which appears to take a middle approach. There, Mr. Wolf lifted a heavy timber at work and injured his lower back. *Id.* at 667. He filed a

workers' compensation claim. *Id.* His employer was self-insured, and Mr. Wolf's claim

was administered by Scott Wetzel Services, Inc. (SWS). *Id.* Mr. Wolf received time loss

and medical payments. About six months after the injury, SWS learned from Mr. Wolf's

attending physician that Mr. Wolf could return to work. *Id.* As a consequence, SWS

closed Mr. Wolf's claim. *Id.* A few months later, Mr. Wolf and his new physician

requested the claim to be reopened on the basis that the lower back injury "'may have

contributed to psychological problems.'" *Id.* SWS denied the request. *Id.* Mr. Wolf

appealed the denial and the denial eventually was reversed. *Id.* Mr. Wolf brought suit

against SWS alleging bad faith denial of his claim and outrage. *Id.*

In denying Mr. Wolf's outrage claim, our high court explained:

> As illustrative of what constitutes [outrage], . . . [i]n [an appellate case from
> California], it was alleged that an investigator hired by the insurance carrier
> befriended the claimant, misrepresenting his true capacity and intentions.
> Then, during an excursion to Disneyland, the investigator enticed the
> claimant into crossing a rope bridge and engaging in other physically
> demanding activities. Unbeknownst to the claimant, another investigator
> filmed her while she did so. Upon discovering at a subsequent hearing how
> she had been deceived, the claimant suffered a physical and mental
> breakdown requiring hospitalization. We agree that such conduct is indeed
> outrageous under the standard adopted by this court.
>         The same cannot be said for the conduct involved in the present
> case. . . . The facts . . . in the present case in no way suggest that the claims
> administrator for the self-insured employer engaged in conduct that could
> constitute the tort of outrage. Furthermore, . . . Mr. Wolf is alleging only
> "bad faith" in the administration of his workers' compensation claim.

16

*Id.* at 678-79[5] (footnote omitted).

As the cases reflect, what constitutes outrage is nebulous and difficult to define. But three things are clear. First, to impose liability, the law requires the conduct to be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency as to be utterly intolerable in a civilized community. *Reyes*, 191 Wn.2d at 91. Second, liability may not be imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Strong*, 147 Wn. App. at 386; *Snyder*, 98 Wn. App. at 321-22. And third, somewhere between these standards, the question of liability passes from a court of law to the trier of fact. *Robel*, 148 Wn.2d at 51.

Had Mr. Patnode remote-started his truck occasionally to scare passing piano students, this would not be actionable. Rather, it would constitute a mere annoyance—a triviality. But this is not what Mr. Patnode did. Instead, he engaged in a course of conduct over a period of four months intending to cause Ms. Spicer sufficient emotional distress so she would stop teaching piano lessons at her house. He intended to achieve through harassment what he had been unable to achieve through legal means. In order to

---

[5] The *Wolf* court's analysis comports with the various illustrations contained in the *Restatement (Second) of Torts* § 46. Whereas the conclusions reached in the intermediate appellate decisions in *Strong* and *Snyder* do not comport with the illustrations.

achieve his purpose, he knew he had to cause Ms. Spicer severe emotional distress. And he did.

The dissent classifies this conduct as merely childish. We disagree. The conduct—because it occurred frequently over a period of months—clearly exceeds insults, indignities, threats, annoyances, petty oppressions, or other trivialities. We believe a trier of fact could consider the conduct to be so outrageous in character, and so extreme in degree, as to be utterly intolerable in a civilized community. For this reason, the question of liability passes from us to the trier of fact.

      3.      SEVERE EMOTIONAL DISTRESS

Mr. Patnode argues substantial evidence does not support the trial court's finding that Ms. Spicer suffered severe emotional distress. We disagree.

We will not overturn a trial court's finding of fact if it is supported by substantial evidence. *Gorman v. Pierce County*, 176 Wn. App. 63, 87, 307 P.3d 795 (2013). Substantial evidence is that amount of evidence sufficient to persuade a fair-minded person that a given premise is the truth. *Phillips*, 29 Wn. App. at 387.

To prevail on an outrage claim, a plaintiff must show that he or she actually suffered severe emotional distress as a result of the defendant's conduct. *Kloepfel*, 149 Wn.2d at 201-03. Mr. Patnode first argues that regularly and repeatedly remote-starting

18

his F-250 over the course of four months, revving its engine, and activating its alarm could not have caused a reasonable person to suffer severe emotional distress. We disagree. It was Mr. Patnode's objective to cause Ms. Spicer to suffer sufficient emotional distress so she would stop teaching piano lessons at her house. This objective could not be accomplished by mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Mr. Patnode's argument that Ms. Spicer could not have suffered severe emotional distress runs counter to his objective. If he did not think his conduct would accomplish his objective, he would not have engaged in it.

Mr. Patnode next argues no one could believe his conduct could reasonably cause Ms. Spicer to fear for her safety. We disagree. One of the parents testified that Mr. Patnode's conduct made her scared and concerned for her children's safety.

Mr. Patnode, citing *Sutton v. Tacoma School District No. 10*, 180 Wn. App. 859, 324 P.3d 763 (2014), argues that Ms. Spicer's symptoms of stress and insomnia were insufficient to constitute extreme emotional distress. There, a teacher pinned a first grade special education student against the wall and cornered her by chest-bumping her while yelling insults at her. *Id.* at 863. The child's grandmother witnessed the incident. *Id.* She testified that the child was scared, angry, sad, and mad, and did not want to return to the teacher's class. *Id.* at 872. We held that this evidence was sufficient to constitute

No. 36065-2-III
*Spicer v. Patnode*

emotional distress. *Id.* However, there was no evidence of how long the emotional distress lasted. *Id.* Because actionable outrage requires emotional distress that is more than transient, we affirmed the trial court's summary judgment. *Id.* at 874.

*Sutton* is distinguishable. Here, Ms. Spicer suffered emotional distress throughout Mr. Patnode's four-month course of conduct.

Affirmed.

Lawrence-Berrey, C.J.

I CONCUR:

Fearing, J.

20

No. 36065-2-III

KORSMO, J. —

Outrageous conduct is conduct "which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim 'Outrageous!'"

*Reid v. Pierce County*, 136 Wn.2d 195, 201-02, 961 P.2d 333 (1998) (quoting *Browning v. Slenderella Sys.*, 54 Wn.2d 440, 448, 341 P.2d 859 (1959) (quoting RESTATEMENT (SECOND) OF TORTS § 46(g) (AM LAW INST. 1965)). As the court more recently stated:

> The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"

*Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 91, 419 P.3d 819 (2018) (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (quoting RESTATEMENT § 46 cmt. d).

The main element of an outrage claim is, of course, outrageous behavior. Remote starting a car or setting off a car alarm when someone is walking past simply is not atrocious conduct, nor is it "utterly intolerable in a civilized community." Mr. Patnode's behavior was juvenile, childish, oafish, puerile, immature, infantile, and lame. It would not have even qualified as a bad junior high school prank in a less sophisticated time. He was annoying, but he was not outrageous.

Washington requires more than this simplistic behavior to satisfy the threshold requirements for the tort of intentional infliction of emotional distress. The definition of the tort is found in RESTATEMENT § 46[1]:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
> (2) Where such conduct is directed at a third person, the person is subject to liability if he intentionally or recklessly causes severe emotional distress
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> (b) to any other person who is present at the time, if such distress results in bodily harm.

Ms. Spicer's action proceeded under § 46(2)(b), meaning that she had to show that outrageous conduct directed at third persons in her presence resulted in bodily harm. While the remaining elements were established, the outrageous conduct element was not. She failed to meet the required threshold showing. *Jackson v. People's Federal Credit Union*, 25 Wn. App. 81, 84, 604 P.2d 1025 (1979).

In *Jackson*, the plaintiff sued in outrage because the credit union had attempted to repossess his car at his place of work after a dispute arose over loan repayment; the incident aggravated his diabetes, a condition known to the credit union. *Id.* at 83-84.

---

[1] No Washington court has applied the *Restatement (Third) of Torts* § 46, so, like the majority, I will confine my remarks to the *Restatement (Second)*. It should be noted that comment i in the *Second Restatement* is now found as comment h in the *Third Restatement*.

2

Division Two of this court rejected the outrage claim, determining that the behavior of the credit union failed to meet the "extreme and outrageous" standard of the tort. *Id.* at 84 (quoting RESTATEMENT § 46 cmt. h).

Proof of outrageous behavior is the sine qua non of this tort. There is no exception for the intentional infliction of distress by nonoutrageous behavior. While the steady dripping of small amounts of water may erode a foundation just as effectively as a deluge, this tort is only concerned with the latter possibility. Behavior must be beyond the pale to be actionable.

Our case law long has reached that same conclusion. Infliction of emotional distress by intentional behavior is by itself inadequate to establish this tort. We have found far more offensive behavior than noisy car alarms and remote vehicle starting *insufficient* to establish outrageous behavior. *E.g.*, *Repin v. State*, 198 Wn. App. 243, 392 P.3d 1174 (2017) (holding that veterinarian's unsuccessful attempt at euthanasia, failure to warn of risks, and the dog's immense suffering not sufficiently outrageous); *Christian v. Tohmeh*, 191 Wn. App. 709, 737-38, 366 P.3d 16 (2015) (doctors' course of conduct—obfuscation of plaintiff's diagnosis, yelling and shouting at her and telling her problems were in her head; telling other doctors that her emotional issues made her history less valid—insufficient to meet the "extremely high" standard of outrage); *Strong v. Terrell*, 147 Wn. App. 376, 388-89, 195 P.3d 977 (2008) (finding conduct insufficient where coworker told blonde jokes, ridiculed plaintiff's personal life, called her a bum, and made

3

other disparaging remarks over the course of several years). *Saldivar v. Momah*, 145 Wn. App. 365, 186 P.3d 1117 (2008) (holding that filing suit against physician with malicious intent is not "'utterly intolerable in a civilized community'").

While no prior Washington case has been based on car noises, a couple of Ohio cases have rejected the notion that such behavior is outrageous. *Krlich v. Clemente*, 2017-Ohio-7945, 98 N.E.3d 752, 757, 759 (Ct. App.) (finding car horn honking "at all hours of the day and night," alleged lewd gestures, and more (such as paintballing plaintiff's home and driving on their lawn) not sufficiently extreme and outrageous for intentional infliction of emotional distress); *Allen v. Pirozzoli*, No. 103632, 2016-Ohio-2645, 2016 WL 1600344 (Ct. App. Apr. 21, 2016) (unpublished) (conduct of setting off fireworks, standing in his driveway when plaintiff would pull in the driveway, horn honking, banging on fence and windows, revving motorcycle in front of plaintiff's house insufficient to establish outrageousness).[2]

Mr. Patnode is clearly a bad neighbor, but he also is bad at being an outrageous one. Although the trial court's desire to punish him for his conduct is understandable, and appreciated by this writer, that conduct simply does not make the grade for the tort of outrage. He intentionally inflicted emotional distress, but did so in a bland enough manner that this particular claim was not actionable. This was harassment pure and

---

[2] Unpublished Ohio opinions may be cited as authority in that state. *See* OHIO SUP. CT. REP. OP. R. 3.4. Thus, they may be relied on in this state. GR 14.1(b).

No. 36065-2-III
*Spicer v. Patnode*

simple. Since the majority rewrites the tort of intentional infliction of emotional distress by treating the outrageous conduct element as a question of fact for the trier-of-fact, I respectfully dissent.

_____
Korsmo, J.

5