

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUN 2 1 2018

CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on June 21, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| JUDITH MARGARITA REYES, on her own behalf and on behalf of the Estate of Jose Luis Reyes, Deceased, and on behalf of her minor children, Erik (n/m/n) Reyes (dob: 3/12/98) and Leslie Maria Reyes (dob: 6/23/99),<br><br>Petitioners,<br><br>v.<br><br>YAKIMA HEALTH DISTRICT, a public entity in the State of Washington; Christopher Spitters, M.D., John Does Nos. 1-20,<br><br>Respondents. | No. 94679-5<br><br>En Banc<br><br>Filed ___ JUN 2 1 2018 ___ |

OWENS, J. — This is a case about the sufficiency of expert witness testimony in a medical malpractice suit. Jose Reyes died after a course of treatment for tuberculosis. Judith Reyes alleges that her husband did not have tuberculosis and that the treatment prescribed to him for that disease caused him fatal liver damage due to an undiagnosed underlying liver disease.

Judith Reyes alleges that the Yakima Health District (YHD) and Christopher Spitters, MD, were negligent in treating Jose Reyes. A year after filing suit, her expert witness submitted an affidavit alleging as much. Because allegations of misdiagnosis without deviation from the proper standard of care are not the basis for liability, we hold that the expert witness' affidavit was insufficient to create a genuine issue of material fact and affirm the Court of Appeals. In so holding, we do not require talismanic words, but the right words. For to paraphrase Mark Twain, the want of the right word makes lightning from lightning bugs.

## FACTS

In April 2010, Mr. Reyes arrived at the Yakima Chest Clinic complaining of intermittent chest pain. He was initially diagnosed with pneumonia, but chest samples were ordered when the symptoms did not abate. A sputum sample tested positive for tuberculosis, and the positive results were reported to YHD. Additional sputum samples also cultured positive for tuberculosis. On May 25, 2010, Mr. Reyes began tuberculosis treatment with the YHD, consisting in part of a four-drug cocktail of isoniazid, rifampin, ethambutol, and pyrazinamide, as well as directly observed therapy. Because isoniazid can lead to severe and sometimes fatal liver toxicity, baseline liver function testing was performed at that time. The results were within the high range of normal. Mr. Reyes missed a series of directly observed therapy days in late June and early July, and was tardy in submitting blood for a liver function test.

2

When a liver specimen was obtained on July 8, 2010, the testing demonstrated abnormal liver values.

Due to these abnormal liver readings, YHD withheld Mr. Reyes' tuberculosis medications and directed him to report to an emergency room for inpatient treatment. YHD also contacted Dr. Spitters at that time, and Dr. Spitters spoke to Mr. Reyes by phone on July 15, 2010. Dr. Spitters directed Mr. Reyes to go to an emergency room, but Mr. Reyes failed to do so. Dr. Spitters preliminarily diagnosed Mr. Reyes with a drug-induced liver injury and instructed YHD staff to continue to hold Mr. Reyes' tuberculosis medication and refer him to an emergency room. Mr. Reyes visited YHD for additional testing on July 16, 2010, and Dr. Spitters saw him on July 22, 2010. Mr. Reyes was admitted to the University of Washington Medical Center's hepatology department, but he passed away from liver failure on August 6, 2010. Ms. Reyes sued YHD and Dr. Spitters, asserting medical malpractice, wrongful death, negligent hiring and supervision, and outrage. The negligent hiring and supervision claim is not part of this appeal.

The trial court granted summary judgment with regard to the medical malpractice claim because Ms. Reyes' medical expert, Rosa Martinez, MD, failed to identify either the standard of care or that she was familiar with that standard, and failed to articulate with sufficient particularity the facts supporting her opinion that YHD and Dr. Spitters were negligent. Ms. Reyes filed an untimely motion for

reconsideration regarding the medical malpractice claim and included a second declaration by Dr. Martinez. The trial court denied the motion for reconsideration, stating it would not consider the second declaration and it would not have been sufficient to create a material issue of fact sufficient to survive summary judgment even if it were considered.

The defendants moved for summary judgment on the outrage claim, alleging that RCW 7.70.010 to .160 had legislatively preempted a claim for outrage derivative of medical malpractice and that the conduct complained of was not outrageous as a matter of law. The specific conduct that Ms. Reyes cited as outrageous was an alleged threat of incarceration made by YHD employees if Mr. Reyes did not comply with his tuberculosis treatment regimen. The trial court granted the motion. Regarding the wrongful death claim, the trial court granted summary judgment due to a violation of the statute of limitations, relying on *Fast v. Kennewick Public Hospital District,* 188 Wn. App. 43, 354 P.3d 858 (2015), which held that the applicable statute of limitations for a wrongful death claim stemming from alleged medical malpractice is the general three-year period in RCW 4.16.080.

Ms. Reyes timely appealed the grant of summary judgment. During the pendency of the appeal, this court reversed *Fast* and held that the one-year tolling provision in RCW 7.70.110 applies to such a claim. *Fast v. Kennewick Pub. Hosp. Dist.,* 187 Wn.2d 27, 384 P.3d 232 (2016). However, the Court of Appeals affirmed

the trial court's grant of summary judgment on the wrongful death claim on other grounds, holding that as with the medical malpractice claim, Dr. Martinez failed to create an issue of fact with regard to any allegedly wrongful conduct performed by the defendants. The Court of Appeals also affirmed the trial court's grant of summary judgment on the claim of outrage, agreeing that the defendants' conduct was not outrageous enough to sustain a claim.

## ISSUES

1. Did the medical expert's testimony create a genuine, material dispute regarding negligent or wrongful conduct by the defendants?

2. Was the alleged threat of quarantine sufficiently "outrageous" to support a claim of outrage?

## ANALYSIS

1. <u>Allegations of Misdiagnosis Alone Are Generally Insufficient To Create a Material Dispute regarding Medical Negligence</u>

In a medical malpractice case, plaintiffs must show that "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1). The applicable standard of care in medical malpractice actions must generally be established through expert testimony. *Miller v. Jacoby*, 145 Wn.2d 65, 71-72, 33 P.3d 68 (2001). If a plaintiff lacks competent expert

testimony to create a genuine issue of material fact with regard to one of the elements of the claim and is unable to rely on an exception to the expert witness testimony requirement, a defendant is entitled to summary judgment. *Morinaga v. Vue*, 85 Wn. App. 822, 935 P.2d 637 (1997). Although a close call, Ms. Reyes has not created a genuine issue of material fact through expert testimony, nor can she rely on the doctrine of res ipsa loquitur to satisfy that pleading requirement.

An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Our analysis thus asks whether Dr. Martinez's testimony could sustain a verdict in Ms. Reyes' favor. As this court held in *Keck*, in the context of medical malpractice, this requires "an expert to say what a reasonable doctor would or would not have done, that the [defendants] failed to act in that manner, and that this failure caused [the] injuries." 184 Wn.2d at 371. The expert may not merely allege that the defendants were negligent and must instead establish the applicable standard and how the defendant acted negligently by breaching that standard. *Id.* at 373. Furthermore, the expert must link her conclusions to a factual basis. *Id.*

A useful contrast can be drawn between two similar cases to demonstrate what is required for a medical expert's testimony to create a genuine issue. In *Keck*, a suit against oral surgeons, the plaintiff's expert testified as follows:

> "The surgeons performed multiple operations without really addressing the problem of non-union and infection within the standard of care. . . .
>
> ". . . With regards to referring Ms. Keck for follow up care, the records establish that the surgeons were sending Ms. Keck to a general dentist as opposed to an oral surgeon or even a plastic surgeon or an Ear, Nose and Throat doctor. Again, this did not meet the standard of care as the general dentist would not have had sufficient training or knowledge to deal with Ms. Keck's non-union and the developing infection/osteomyelitis."

*Id.* at 371. This court held that from this testimony "a jury could conclude that a reasonable doctor would have referred Keck to another qualified doctor for treatment—standard of care—and that the Doctors did not treat her issues or make an appropriate referral—breach." *Id.* at 372.

In *Guile v. Ballard Community Hospital*, a suit alleging negligent gynecological surgery, the plaintiff's expert testified as follows:

> "Mrs. Guile suffered an unusual amount of post-operative pain, developed a painful perineal abscess, and was then unable to engage in coitus because her vagina was closed too tight. All of this was caused by faulty technique on the part of the first surgeon, Dr. Crealock. In my opinion he failed to exercise that degree of care, skill, and learning expected of a reasonably prudent surgeon at that time in the State of Washington, acting in the same or similar circumstances."

70 Wn. App. 18, 26, 851 P.2d 689 (1993). The Court of Appeals held that

statement insufficient, characterizing it as "merely a summarization of Guile's

postsurgical complications, coupled with the unsupported conclusion that the

complications were caused by Crealock's 'faulty technique.'" *Id.*

> In the present case, Dr. Martinez's first affidavit stated:
>
> (a) Jose Reyes did not have tuberculosis when he presented at Yakima Health District and Dr. Spitters, stated with reasonable medical certainty;
> (b) Jose Reyes did suffer from chronic liver disease, and was at risk for catastrophic liver failure if he were treated with medicines contraindicated for liver disease, stated with reasonable medical certainty;
> (c) Jose Reyes presented to Yakima Health District and Dr. Spitters with clinical symptoms of liver failure that should have been easily diagnosed by observation of the patient, stated with reasonable medical certainty;
> (d) The failure of Yakima Health District and Dr. Spitters to accurately diagnose Jose Reyes' liver disease and liver deterioration due to prescribed medications to treat tuberculosis that were contraindicated for Jose Reyes were direct and proximate causes of Mr. Reyes' liver failure and death, stated with reasonable medical certainty.

Clerk's Papers at 109-10. Dr. Martinez's second affidavit relevantly states that "[a]n

alternate drug should have been introduced for Mr. Reyes if the defendants chose to

treat Mr. Reyes empirically for tuberculosis." *Id.* at 231. The theory of Ms. Reyes'

case appears to be that YHD negligently misdiagnosed Mr. Reyes twice: a false

positive for tuberculosis and a false negative for liver disease. Yet allegations of

misdiagnosis alone are not enough. As this court held in *Fergen v. Sestero*,

"Misdiagnosis and the inexactness of medicine is not the basis for liability without a

8

deviation from the proper standard of care." 182 Wn.2d 794, 809, 346 P.3d 708 (2015). Instead, a misdiagnosis may subject a physician to a negligence action "where such misdiagnosis breaches the standard of care." *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 661, 975 P.2d 950 (1999). There is no indication of what a reasonable physician should have done other than diagnose liver failure by observation of the patient. This circular conclusion is akin to the deficient expert witness testimony in *Guile*, where an allegation that a reasonable doctor would not have acted negligently was found insufficient to create a genuine issue of material fact. 70 Wn. App. at 26.

Nor can negligence be inferred from the factual allegations relating to Mr. Reyes' tragic death. *See Watson v. Hockett*, 107 Wn.2d 158, 161, 727 P.2d 669 (1986) ("[A] doctor will not normally be held liable under a fault based system simply because the patient suffered a bad result."). Allegations amounting to an assertion that the standard of care was to correctly diagnose or treat the patient are insufficient. Instead, the affiant must state specific facts showing what the applicable standard of care was and how the defendant violated it. Dr. Martinez failed to do so. In affirming the Court of Appeals, we do not require affiants to aver talismanic magic words, but allegations must amount to more than conclusions of misdiagnosis, with a basis in admissible evidence that can support a claim. *See Keck*, 184 Wn.2d at 370.

In the alternative, Ms. Reyes invokes the doctrine of res ipsa loquitur to make out a prima facie claim for medical malpractice without expert testimony. That doctrine is inapplicable in this case because Ms. Reyes has failed to show that the act of prescribing isoniazid does not ordinarily happen in the absence of negligence.

The standard elements of a negligence claim are duty, breach, causation, and damage. A plaintiff can, in limited circumstances, rely on the doctrine of res ipsa loquitur to satisfy the breach element of his or her pleading requirements, provided that the evidence shows that "'(1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff.'" *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003) (quoting *Zukowsky v. Brown*, 79 Wn.2d 586, 593, 488 P.2d 269 (1971)). Here, the first element is absent.

The first element may be satisfied in one of three ways: "'(1) [w]hen the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.'"

10

*Id.* at 438-39 (quoting *Zukowsky*, 79 Wn.2d at 595).

The act of prescribing isoniazid is not so "palpably negligent" as leaving foreign objects in a body or amputating the wrong limb. Nor can a layperson's "general experience and observation" show that it is negligent. That is why expert testimony is required. Such testimony was absent in this case. Thus, res ipsa loquitur is not applicable and cannot be used as a stand-in for expert testimony.

Ms. Reyes has thus failed to create a genuine issue of material fact with regard to any conduct of any defendant that breaches a specified standard of care. This is not a case where the plaintiff did not have ample time to procure an adequate expert witness affidavit. Civil Rule 56(f) provides safeguards for such instances. Dr. Martinez had been working with the plaintiffs for over a year, which formed part of the trial judge's decision to decline to review her second affidavit. Accordingly, this court affirms the Court of Appeals' grant of summary judgment for both of those claims.

2. Properly Invoking a Quarantine Power Is Not Outrageous

In addition, we affirm the grant of summary judgment on the outrage claim. Ms. Reyes' outrage claim is based on the disputed allegation that YHD employees threatened Mr. Reyes with incarceration if he did not comply with the prescribed tuberculosis treatment regimen. The elements of a claim for the tort of outrage or the intentional infliction of emotional distress are "(1) extreme and outrageous conduct,

(2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195, 66 P.3d 630 (2003). The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (italics omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW INST. 1965)). Liability generally will not extend to threats alone. *Id.*

That same section of the *Restatement* speaks to conduct that would be extreme and outrageous but for a legal privilege to do it. RESTATEMENT § 46 cmt. g ("The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."). The invocation of a legal privilege does not per se immunize one's conduct from a claim for intentional infliction of emotional distress. Were an official to use the threat of quarantine improperly, either to induce action other than compliance with a treatment regimen or where there is no reasonable basis to believe that a quarantine is warranted, a claim may be warranted. *See* RESTATEMENT § 46 cmt. e.

In this case, the defendants had the power to execute the complained of conduct. Washington State has a statutory scheme for diagnosing and treating tuberculosis because the illness is highly contagious and has a relatively high virulence. *See* RCW 70.28.005(2) ("While it is important to respect the rights of individuals, the legitimate public interest in protecting the public health and welfare from the spread of a deadly infectious disease outweighs incidental curtailment of individual rights that may occur in implementing effective testing, treatment, and infection control strategies."). Noncompliance with a tuberculosis treatment regimen is a misdemeanor, and RCW 70.28.031 provides local health officers with the power to issue a quarantine order for persons who have been previously diagnosed as having tuberculosis and who are under medical orders for treatment or periodic follow-up examinations.

The allegedly outrageous conduct was a threat of invoking the quarantine power granted to health officials to combat the public enemy of tuberculosis. A suit may arise when the manner of invoking a legal power intentionally inflicts emotional distress, but here, no such allegations were made. The alleged conduct of the YHD employees was not wrongful, let alone outrageous. Because the alleged conduct was not outrageous as a matter of law, we affirm the Court of Appeals' grant of summary judgment with regard to the outrage claim.

## CONCLUSION

Dr. Martinez's affidavits amount to allegations of misdiagnoses but do not explain the acts that the defendants should have taken to avoid these allegedly erroneous conclusions. Because a misdiagnosis and resulting bad outcome alone is not generally enough to support a claim for medical negligence, we affirm the trial court's grant of summary judgment on the medical malpractice and wrongful death claims. As well, we affirm the grant of dismissal on the outrage claim and find the defendants' alleged conduct was not outrageous.

*Reyes, et al. v. Yakima Health Dist., et al.*
No. 94679-5

Owens, J.

WE CONCUR:

Fairhurst, C.J.

Wiggins, J.

Johnson, J.

Madsen, J.

Gordon McCloud, J.

Stephens, J.

15

No. 94679-5

GONZÁLEZ, J. (concurring in part and dissenting in part)—The plaintiffs here have suffered a tragic loss, the death of a family member. They contend that this death was the result of medical malpractice. The defendants staunchly deny the claim and suggest Jose Luis Reyes himself is significantly to blame for his own death. We must decide whether Reyes's estate and family have submitted sufficient evidence to allow a jury to decide the cause.

I agree with the majority that this is a close call. I also agree that talismanic words are not required to overcome a defendant's motion for summary judgment on a medical malpractice claim. Taking all evidence, as we must, in the light most favorable to the plaintiffs, they have shown that a material question of fact necessitates denial of Yakima Health District's motion for summary judgment. To the extent the majority holds otherwise, I respectfully dissent.

This case turns on whether the declaration of the plaintiff's expert, Dr. Rosa Martinez, was sufficient to support the conclusion that Reyes's death "'resulted from the failure of a health care provider to follow the accepted standard of care.'" *Keck v. Collins*, 184 Wn.2d 358, 371, 357 P.3d 1080 (2015) (quoting RCW 7.70.030). Plainly, Dr. Martinez, the former head of an internal medicine department at a teaching hospital practicing in the local area, was qualified to testify to both the standard of care and its breach. *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 452-53, 177 P.3d 1152 (2008). Dr. Martinez testified that Reyes "presented . . . clinical symptoms of liver failure that should have been easily diagnosed by observation of the patient." Clerk's Papers at 110. Dr. Martinez's declaration detailed escalating symptoms of liver failure. She specifically testified that one of the prescribed drugs, INH (isonicotinyl hydrazide), "clearly should not be administered to a patient with liver problems." *Id.* She concluded that Reyes died due to the defendants' failure "to observe the standard of care for health care institutions and physicians acting in the same or similar circumstances in the State of Washington." *Id.* at 113. Based on her testimony and construed in the light most favorable to the plaintiff, a jury could conclude that the defendants failed to meet that standard of care and that failure proximately caused Reyes's death.

The majority, like the defendants, make much of Reyes's alleged noncompliance with the (allegedly inappropriate) tuberculosis treatment regime. Allocation of fault is properly a matter for the jury, not this court, to resolve. I note in passing that Dr. Martinez's declaration suggests that compliance was increasingly painful (including an extremely swollen abdomen, extreme skin discoloration, nausea, and vomiting) and likely led directly to Reyes's death.

The majority seems to suggest that Dr. Martinez's declaration was insufficient because it did not state "what a reasonable physician should have done" and did not "explain the acts that the defendants should have taken." Majority at 9, 13. I find no case—and the majority cites none—that establishes that the plaintiff's expert must "explain the acts the defendants should have taken" to overcome a defendant's summary judgment motion. Certainly, such an explanation could be sufficient to establish the standard of care and provide eloquent evidence of its breach. *See, e.g., Keck*, 184 Wn.2d at 372. But it is not necessary. Instead, under our law, the plaintiff "needs an expert to say what a reasonable doctor would *or would not have* done, that the [defendants] failed to act in that manner, and that this failure caused her injuries." *Id.* at 371 (emphasis added). Further, taken in the light most favorable to the plaintiffs, Dr. Martinez did testify so—her declaration makes clear that given the symptoms Reyes

presented, a competent health care provider would have realized he was suffering from liver toxicity and would have stopped administering isonicotinyl hydrazide.

To the extent the majority holds otherwise, I respectfully dissent.

González, J.