# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| SREYA VUTH, | No. 60445-1-II |
| Petitioner, | |
| v. | |
| MEHRAN TAVAKOLI, | PUBLISHED OPINION |
| Respondent. | |

LEE, J. — Sreya Vuth appeals the trial court's grant of partial summary judgment in favor of her ex-husband, Mehran Tavakoli, limiting Vuth's claim against Tavakoli for intentional infliction of emotional distress (IIED) to conduct that occurred within the three-year statute of limitations for IIED. Vuth argues that her claim for IIED involves acts of domestic violence, and acts of domestic violence should be considered a continuous whole when applying the statute of limitations. In other words, Vuth asks this court to apply the continuous tort doctrine to claims of IIED involving domestic violence.

Extending the continuing tort doctrine to IIED claims involving domestic violence is supported by (1) Washington's approach to IIED claims generally, (2) Washington's current application of the continuing tort doctrine, (3) other jurisdictions' application of the continuing tort doctrine to claims of IIED involving domestic violence, and (4) the Washington legislature's recognition of domestic violence as a problem of immense proportions that needs addressing in this state. Such an extension of the continuing tort doctrine to IIED claims involving domestic violence comports both with the general principles behind IIED claims and the continuing tort

doctrine, and it would further Washington's public policy of improving the lives of victims of domestic violence.

Accordingly, we hold that the continuing tort doctrine applies to IIED claims involving domestic violence as it pertains to the statute of limitations. Thus, we reverse the trial court's grant of partial summary judgment and remand to the trial court for further proceedings consistent with this opinion.

FACTS

A.    BACKGROUND

Vuth and Tavakoli met in Cambodia in 2016. At the time, Vuth was a Cambodian citizen and Tavakoli resided in the United States. Vuth and Tavakoli began dating. Tavakoli proposed to Vuth in 2018 and applied for a fiancée visa[1] on her behalf. Vuth and Tavakoli married in California in July 2019.

1.    Incidents Before May 31, 2020

According to Vuth, once she arrived in the United States, Tavakoli began physically, mentally, and emotionally abusing her. Tavakoli "constantly hit [Vuth], pulled [her] hair, slapped [her], or threw [her] across the room when he was upset." Clerk's Papers (CP) at 37. Tavakoli forced Vuth to have sex with him against her will more than 20 times, and on one occasion, held her arms behind her and raped her, causing her "vaginal area to painfully swell for over a week." CP at 37. Tavakoli forced Vuth to perform oral sex on him, which caused her to vomit. Tavakoli

---

[1] A fiancée visa, or a K-1 nonimmigrant visa, allows a U.S. citizen to bring his or her foreign fiancé(e) to the U.S. to get married. *Visas for Fiancé(e)s of U.S. Citizens*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/family/family-of-us-citizens/visas-for-fiancees-of-us-citizens (last visited June 16, 2026).

was aware oral sex made Vuth sick, but he would pull her hair and force her to continue anyway. If Vuth refused, Tavakoli would hit or push her. If Tavakoli ever began talking about sex, Vuth tried to change the subject "to avoid being assaulted again." CP at 37.

Tavakoli regularly gave Vuth unprescribed medications, telling her the medications were "for [her] bones." CP at 37. Tavakoli would then rape Vuth while she was asleep or semi-conscious. Vuth later discovered that the medications included chlordiazepoxide and lorazepam, both benzodiazepines.[2]

Tavakoli allegedly recorded himself and Vuth having sex, and he threatened to post the video if Vuth spoke with the police. On several occasions, Tavakoli dragged Vuth to the bathtub and dunked her head under the water to prevent her from leaving or yelling for help. Tavakoli threatened to kill Vuth "if she didn't stop disobeying him," and on one occasion, told Vuth he would cut off her head, put it in a suitcase, and mail it to her mother. CP at 5. Tavakoli threatened harm to Vuth's family and told Vuth he would send someone to kill her family members if Vuth did not listen to him.

In August 2019, Tavakoli applied for an adjustment of Vuth's immigration application status based on their marriage in July 2019. However, throughout their marriage, Tavakoli threatened to withdraw Vuth's immigration application if she reported his abuse to the police. On one occasion, Vuth attempted to escape Tavakoli when he was angry; however, he caught her and slammed a door on her foot. Vuth's foot was "swollen, bleeding and painful" for weeks, and she

---

[2] Benzodiazepines are a class of medications that decrease nervous system activity and are "most often used for treating anxiety and related mental health conditions, as well as brain-related conditions like seizures." *Benzodiazepines (Benzos)*, CLEVELAND CLINIC (Jan. 3, 2023), https://my.clevelandclinic.org/health/treatments/24570-benzodiazepines-benzos.

had to plead with Tavakoli to take her to a doctor. CP at 37. When Tavakoli finally took her to the doctor, he instructed Vuth to lie about her name and date of birth.

Tavakoli controlled Vuth's food access. According to Vuth, Tavakoli did not allow her to eat or drink throughout the day. Once, Vuth snuck a banana because she was so hungry. After she had eaten the banana, Tavakoli grabbed Vuth's face and forced her mouth open to see if she had eaten without his permission. Vuth was not allowed to go outside on her own. Vuth had no access to money and her English was limited. Tavakoli kept Vuth's passport in his possession. Because of Tavakoli's treatment, Vuth fell into depression. Vuth felt panic, had trouble sleeping, and engaged in self-harm.

2.     Incident After May 31, 2020

On June 1, 2020, Vuth had a dental appointment. As Tavakoli drove her home, Vuth requested that they stop for some food because she had not eaten or drank anything the entire day. Tavakoli refused and demanded that Vuth "apologize by washing his feet" when they got home. CP at 38. Vuth refused to wash Tavakoli's feet, and he pushed her head, causing her head to hit the car window. Vuth then grabbed her phone and Tavakoli's phone—which had the ability to make phone calls, while hers did not—and tried to exit the car. However, Tavakoli yanked her back inside. Vuth scratched at Tavakoli to get him to release her. Vuth eventually got free and ran to a nearby building, where she asked a building employee to call the police. The building employee had witnessed the incident and told police that "she had seen Mr. Tavakoli hit Ms. Vuth's head against the vehicle window multiple times." CP at 7.

Detective Ashley Hershberger responded. Through a translator, Vuth described her fear of Tavakoli and the ongoing abuse. Detective Hershberger observed Vuth crying and visibly shaking

4

while they spoke. Vuth informed Detective Hershberger that she had no money, no friends or family in the area, and did not know her address. While Detective Hershberger spoke with Vuth, Tavakoli called his phone, which was in Vuth's possession, from another number several times. Tavakoli told Vuth over the phone to stop speaking with the police, inform them that he had not done anything wrong, and told Vuth she was acting inappropriately. Tavakoli repeatedly asked Vuth to walk and meet him in a different location because he could see police in the area.

Vuth told Detective Hershberger that she did not want Tavakoli to know she had spoken with law enforcement. Vuth repeatedly stated she had to "put up with" the abuse so she could keep her family safe and get a green card. CP at 124. Detective Hershberger observed that Vuth was "very emotional and crying and rocking back and forth." CP at 124. Vuth expressed fear for her family, herself, and that Tavakoli would cancel her immigration application. Detective Hershberger told Vuth that the police were going to arrest Tavakoli based on what Vuth had described. Vuth "fell to her knees" crying and pleaded with Detective Hershberger not to arrest Tavakoli, "saying her family was going to be attacked[,] and she was going to be sent back to Cambodia and loose her green card." CP at 125.

Law enforcement arrested Tavakoli. The State charged Tavakoli with several counts, including rape, intimidating a witness, assault, and harassment. Following a settlement offer from the prosecutor's office, Tavakoli pleaded guilty to third degree assault—domestic violence.

Vuth and Tavakoli's marriage dissolution was finalized in November 2023. In conjunction with the final dissolution order, the trial court entered a lifetime protection order against Tavakoli,

prohibiting him from contacting Vuth.

B.  CIVIL CLAIM AND SUMMARY JUDGMENT

On May 31, 2023, Vuth filed a complaint against Tavakoli, alleging IIED,[3] or in the alternative, negligent infliction of emotional distress.  Vuth alleged the facts described above in support of her claims.

In July 2024, Tavakoli moved for summary judgment,[4] arguing in part that Vuth's allegations of Tavakoli's conduct were all barred by the statute of limitations found under either RCW 4.16.100[5] or RCW 4.16.080.[6]  In response, Vuth argued that her claims were not barred under the continuing tort doctrine, which provides that the statute of limitations begins to run when the last tortious act occurred.

---

[3] Vuth's complaint stated the claim of "outrage."  CP at 8.  "The tort of outrage is synonymous with a cause of action for intentional infliction of emotional distress." *Christian v. Tohmeh*, 191 Wn. App. 709, 735, 366 P.3d 16 (2015), *review denied*, 185 Wn.2d 1035 (2016).

[4] Tavakoli filed a "Combined Motion for Judgment on the Pleadings and Summary Judgment" pursuant to CR 12(c) and CR 56.  CP at 30.  However, because the trial court considered matters outside the pleadings, the trial court treated Tavakoli's motion as a motion for summary judgment pursuant to CR 56.  CR 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56.").  Thus, this opinion will refer to Tavakoli's motion as a motion for summary judgment.

[5] RCW 4.16.100 provides the statute of limitations for actions limited to two years, which include assault and battery claims.

[6] RCW 4.16.080 provides the statute of limitations for actions limited to three years, which include claims of IIED.  *Cox v. Oasis Physical Therapy, PLLC*, 153 Wn. App. 176, 192, 222 P.3d 119 (2009).

In August 2024, the trial court held a summary judgment hearing.[7] Tavakoli argued that Vuth was attempting to disguise assault claims, which were subject to a two-year statute of limitations, under a claim of IIED. Tavakoli further asserted that the trial court would need to create new law as the continuing tort doctrine did not apply to assaults and threats, and each of Vuth's allegations would have given rise to its own cause of action.

Vuth acknowledged that whether the continuing tort doctrine should apply to IIED claims involving domestic violence was an issue of first impression in Washington. Vuth pointed to case law from other jurisdictions that have extended the continuing tort doctrine to cases of domestic violence, such that the statute of limitations began to run based on the last tortious act, and courts considered acts of domestic violence "as a continuous whole." 1 Verbatim Rep. of Proc. (VRP) at 14. Vuth also stated that she was not bringing any assault claims; rather, she was only asserting a claim for IIED.

The trial court disagreed with Tavakoli that Vuth was attempting to disguise assault claims; thus, the three-year statute of limitations for IIED claims applied. However, the trial court declined to adopt the continuing tort doctrine based on the doctrine's limited application in Washington. The trial court stated: "I do think that there are strong public policy reasons why you would want to prevent . . . domestic abuse and violence and why it might be that the [c]ontinuing [t]ort [d]octrine would be appropriate, but this Court isn't willing to be the one to create that doctrine." 1 VRP at 31-32. Accordingly, the trial court granted in part and denied in part Tavakoli's motion

---

[7] During the hearing, Vuth abandoned her claim for negligent infliction of emotional distress. The trial court dismissed Vuth's negligent infliction of emotional distress claim with prejudice. Vuth did not appeal the dismissal of the negligent infliction of emotional distress claim.

for summary judgment, and limited Vuth's claim of IIED to "incidents that occurred between May 31, 2020 and May 31, 2023." CP at 170.

In September 2024, Vuth petitioned the Washington Supreme Court for direct review. In December 2024, our Supreme Court declined review and transferred Vuth's motion for discretionary review to this court. This court accepted review.

ANALYSIS

Vuth argues that the trial court erred in granting partial summary judgment to Tavakoli. Specifically, Vuth asserts that because Washington "generally defines domestic violence as an ongoing pattern of conduct," the trial court should have applied the continuing tort doctrine to her claim of IIED, which involved acts of domestic violence. Br. of Appellant at 6. Tavakoli argues that the trial court properly applied the statute of limitations by excluding incidents outside the three-year statute of limitations and contends that Vuth now asks this court to create a new cause of action unsupported by Washington law. We agree with Vuth.

A.     LEGAL PRINCIPLES

1.     Summary Judgment

A court may grant a motion for summary judgment "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Carter v. MultiCare Health Sys.*, 31 Wn. App. 2d 755, 776, 553 P.3d 98 (2024); CR 56(c). We review the trial court's order granting summary judgment de novo, construing all facts and reasonable inferences in a light most favorable to the nonmoving party. *Carter*, 31 Wn. App. 2d at 776.

"'A motion for summary judgment based on a statute of limitations should be granted only if the record demonstrates that there is no genuine issue of material fact as to when the statutory

period commenced.'" *Cox v. Oasis Physical Therapy, PLLC*, 153 Wn. App. 176, 186, 222 P.3d 119 (2009) (quoting *Zaleck v. Everett Clinic*, 60 Wn. App. 107, 110, 802 P.2d 826 (1991)). "A 'genuine issue' is one on which reasonable people may disagree; a 'material fact' is one controlling the litigation's outcome." *Youker v. Douglas County*, 178 Wn. App. 793, 796, 327 P.3d 1243, *review denied*, 180 Wn.2d 1011 (2014).

### 2. Continuing Tort Doctrine

The continuing tort doctrine is an equitable exception to a statute of limitations, applying "when no single incident in a chain of tortious activity can fairly or realistically be identified as the cause of significant harm." *M.R. v. State*, 4 Wn.3d 702, 721, 568 P.3d 299 (2025); *Antonius v. King County*, 153 Wn.2d 256, 262, 103 P.3d 729 (2004). Accordingly, when "at least one act falls within the limitations period, the entire course of conduct does too." *M.R.*, 4 Wn.3d at 721.

Washington courts have recognized the continuing tort doctrine in limited circumstances, typically in cases of workplace harassment or discrimination and damages to real property. *See generally, e.g.*, *Antonius*, 153 Wn.2d at 268-69 (workplace discrimination); *Cox*, 153 Wn. App. at 191-92 (workplace discrimination); *Fradkin v. Northshore Util. Dist.*, 96 Wn. App. 118, 124-25, 977 P.2d 1265 (1999) (property damage and continuing trespass). Courts have rejected the extension of the continuing tort doctrine in claims of negligence and negligent investigation. *Carter*, 31 Wn. App. 2d at 777; *Cox*, 153 Wn. App. at 192. Recently, however, the Washington Supreme Court applied the continuing tort doctrine to claims of childhood sexual abuse in relation to the statute of limitations found under RCW 4.16.340, stating that the abuse at issue in the case "share[d] many similar aspects to a continuing tort: the harm suffered was continuous, [the victim's] relationship with [the perpetrator] was one involving trust and power, and the acts of

9

abuse [were] closely related such that it may be unfair to deny [the victim] the right to bring the action in a single claim." *M.R.*, 4 Wn.3d at 721-22.

3.      Intentional Infliction of Emotional Distress

To survive summary judgment on claims of IIED, also known as the tort of outrage, a party must show: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress." *Christian v. Tohmeh*, 191 Wn. App. 709, 735, 366 P.3d 16 (2015), *review denied*, 185 Wn.2d 1035 (2016).   These elements are questions of fact.  *Id.* at 736.

"[T]he conduct at issue 'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Spicer v. Patnode*, 9 Wn. App. 2d 283, 292, 443 P.3d 801 (2019) (internal quotation marks omitted) (quoting *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 91, 419 P.3d 819 (2018)).  Accordingly, "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'" do not suffice in claims of IIED.  *Id.* (internal quotation marks omitted) (quoting *Kloepfel v. Bokor*, 149 Wn.2d 192, 196, 66 P.3d 630 (2003)).

IIED claims are subject to a three-year statute of limitations.  RCW 4.16.080; *Cox*, 153 Wn. App. at 192.  Generally, this means that the tortious conduct must fall within the three-year statutory period to be timely.  *See Cox*, 153 Wn. App. at 192.

B.      CONTINUING TORT DOCTRINE SHOULD APPLY TO IIED CLAIMS INVOLVING DOMESTIC VIOLENCE

Vuth asks this court to view Tavakoli's abuse of Vuth "as a continuous whole," thus allowing her claim of IIED to include instances of abuse back to 2019.  Br. of Appellant at 15.

Vuth points to Washington's legislative recognition that domestic violence is a "significant public problem" and that Washington courts have applied the continuing tort doctrine in analogous circumstances. Br. of Appellant at 9. Vuth also points to other jurisdictions that have defined domestic violence as a "continuing act" in further support of her argument. Br. of Appellant at 13.

Conversely, Tavakoli contends that Vuth's argument is really one for equitable tolling and that Vuth asks this court to "judicially create a new tolling provision." Br. of Resp't at 4 (underlining omitted). Tavakoli also argues several of Vuth's allegations are allegations of assault, which carry a two-year statute of limitations, and Vuth was never prevented from filing claims within the applicable limitations period.[8] Moreover, Tavakoli asserts the legislature has "never indicated an intent" to create a continuing tort in domestic violence contexts and for this court to do so now is contrary to Washington law. Br. of Resp't at 13.

As both parties acknowledge, the application of the continuing tort doctrine to claims of IIED involving domestic violence, as it pertains to the statute of limitations, is an issue of first impression. Our review is de novo, and because we are reviewing a summary judgment order, we must construe all facts and reasonable inferences from those facts in a light most favorable to the nonmoving party. *Carter*, 31 Wn. App. 2d at 776.

---

[8] At the summary judgment proceedings, the trial court determined the applicable statute of limitations was RCW 4.16.080, the three-year statute of limitations for IIED claims. We accepted review based only on the single issue of whether acts of domestic violence should be considered a continuous whole for the purposes of the statute of limitations in claims of IIED involving domestic violence. *See generally* RAP 2.3(e) (stating "the appellate court may specify the issue or issues as to which review is granted"). Accordingly, we decline to address Tavakoli's argument that the two-year statute of limitations applies. RAP 2.3(e).

Given Washington's approach to IIED claims generally, Washington's current application of the continuing tort doctrine, other jurisdictions' application of the continuing tort doctrine to IIED claims involving domestic violence, and Washington's recognition of the significant problems of domestic violence, we hold that acts of domestic violence may constitute a continuing course of conduct for statute of limitations purposes in claims of IIED involving domestic violence.[9] We recognize that the conduct underlying IIED claims involving domestic violence with different fact patterns may not necessarily constitute a continuing course of conduct. However, in this case, Tavakoli's conduct towards Vuth may be considered a continuing course of conduct, and because the last incident of abuse that Vuth alleges falls within the statutory limitations period, the entire course of conduct does as well. Accordingly, we reverse the trial court's grant of partial summary judgment based on the statute of limitations.

1.      Washington's Approach to IIED Claims

A primary focal point of IIED cases is whether conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency as to be utterly intolerable in a civilized community." *Spicer*, 9 Wn. App. 2d at 296; *e.g.*, *Christian*, 191 Wn. App. at 736; *Reyes*, 191 Wn.2d at 91. A court's consideration of whether conduct is extreme and outrageous enough for a claim of IIED may include the following factors, such as:

> (1) the position the defendant occupied, (2) whether the plaintiff was particularly susceptible to emotional distress and the defendant was aware of the susceptibility, (3) whether the defendant's conduct was privileged, (4) whether the degree of emotional distress was severe as opposed to merely annoying, inconvenient or embarrassing, and (5) whether the defendant was aware of a high probability that

---

[9] We take no position on whether IIED claims not involving domestic violence should be considered a continuous tort.

his or her conduct would cause severe emotional distress and consciously disregarded that probability.

*Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 870, 324 P.3d 763 (2014).

Inherent in these considerations, and as articulated by Washington courts, is that conduct "should *not be viewed in isolation* but considered in the *context of the undisputed facts concerning the entire relationship between the parties*" and courts should consider the totality of the evidence pertaining to the conduct. *Christian*, 191 Wn. App. at 741 (emphasis added).

For instance, in *Spicer*, for a period of several months, the appellant, Patnode, parked his Ford F-250 pickup truck next to the respondent's home and "regularly and repeatedly" remote-started his truck and set off its alarm whenever the respondent's piano students and their parents walked by, frightening them. 9 Wn. App. 2d at 287. This court held, in part, that considering the conduct occurred frequently over months, a trier of fact could consider the conduct outrageous and extreme. *Id.* at 285 (stating "the same conduct done frequently over a period of weeks or months with the intent to cause severe emotional distress to a person can form the basis of an outrage claim").

Here, excluding the introduction of evidence of domestic violence incidents before May 31, 2020 based on the statute of limitations will remove the context of Vuth's circumstances. It is the entirety of Vuth's circumstances, *considered as a whole*, that give rise to her IIED claim that Tavakoli's conduct was extreme and outrageous. This notion finds support in IIED case law, which provides that courts should consider the totality of the evidence pertaining to the conduct, the relationship of parties, and whether the conduct was repeated or an isolated incident. *Id.* at 285; *Christian*, 191 Wn. App. at 741; *Sutton*, 180 Wn. App. at 870. Accordingly, we hold that

13

IIED cases in Washington support the theory that in IIED claims involving domestic violence, the domestic violence conduct should be considered as a continuous whole.

> 2.      Washington's Application of the Continuing Tort Doctrine

Washington courts' application of the continuing tort doctrine, while limited, also provides support for its application to IIED claims involving domestic violence.

In *Antonius*, the Washington Supreme Court analyzed a hostile work environment claim under a framework introduced in *National Railroad Passenger Corp. v. Morgan*.[10]  153 Wn.2d at 265-66.  The Washington Supreme Court noted that in *Morgan*, the United States Supreme Court "focused on the nature of the claim itself as a series of acts that collectively constitute one unlawful employment practice.  As a unitary whole, the claim is not untimely if one of the acts occurs during the limitations period because the claim is brought after the practice, as a whole, occurred and within the limitations period."  *Id.*  The Washington Supreme Court found such reasoning persuasive, stating:

> [T]he nature of the hostile work environment claim strongly indicates that it should not be parsed into component parts for statute of limitations purposes.  *Morgan* underscores the fact that the law does not usually allow a remedy in a hostile work environment case unless there is a pervasive pattern of unlawful treatment over a period of time.

*Id.* at 268.  While a hostile work environment claim is different than an IIED claim involving domestic violence, both contain similar hallmarks—one act may not be sufficient to give rise to a claim, but a series of acts can collectively constitute unlawful conduct.

---

[10]  536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

More recently, in *M.R.*, the Washington Supreme Court recognized that "continuing sexual abuse by the same perpetrator constitutes a continuing tort for statute of limitations purposes." 4 Wn.3d at 721. While the court's analysis was based on specific language within the statute of limitations at issue—RCW 4.16.340, which the court deemed suggestive of a legislative intent to account for the continuing tort doctrine—the court also articulated general principles regarding the continuing tort doctrine that are more broadly applicable. *Id.* at 721-22. Specifically, the court stated, "Washington has recognized the continuing tort doctrine in certain cases involving continuous violations where a literal application of the statute of limitations would result in injustice." *Id.* at 721. Here, a literal application of the three-year statute of limitations to Vuth's claim, especially when the conduct at issue was continuous and uninterrupted between 2019 and 2020, would result in injustice insofar as Vuth would be unable to present evidence of the magnitude and extent of Tavakoli's conduct.

Moreover, based on the premise that "the continuing tort doctrine is applied for statute of limitations purposes when no single incident in a chain of tortious activity can fairly or realistically be identified as the cause of significant harm," it is difficult to identify reasons why the doctrine *should not* be applied IIED claims involving domestic violence. *Id.* Indeed, "continuing sexual abuse by the same perpetrator" in some cases may have little to no distinction from an IIED claim involving domestic violence. *Id.* Accordingly, the theory behind the continuing tort doctrine, as articulated by the Washington Supreme Court, supports its extension to IIED claims involving domestic violence.

15

3.       Other Jurisdictions Recognize the Continuing Tort Doctrine in IIED Claims Involving Domestic Violence

When addressing matters of first impression, this court may look to other jurisdictions for guidance. *Dellen Wood Prods., Inc. v. Dep't of Lab. & Indus.*, 179 Wn. App. 601, 617 n.20, 319 P.3d 847, *review denied*, 180 Wn.2d 1023 (2014). Other jurisdictions recognize the continuing tort doctrine in IIED claims involving domestic violence as it relates to statutes of limitations.

*Feltmeier v. Feltmeier*, an Illinois Supreme Court case, presented circumstances analogous to those here: whether a spouse's claim of IIED involving domestic violence was barred by the applicable statute of limitations. 207 Ill. 2d 263, 277, 798 N.E.2d 75, 278 Ill. Dec. 228 (2003). The court discussed Illinois' continuing tort rule, which provided "'where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.'" *Id.* at 278 (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 345, 770 N.E.2d 177, 264 Ill. Dec. 283 (2002)). The court further stated: "A continuing tort . . . does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." *Id.* at 279.

The court held that the conduct at issue did not constitute distinct and separate incidents:

> In the instant case, Robert cites *Belleville Toyota* and maintains that "each of the alleged acts of abuse inflicted by Robert upon Lynn over a 12 year period are separate and distinct incidents which give rise to separate and distinct causes of action, rather than one single, continuous, unbroken, violation or wrong which continued over the entire period of 12 years." We must disagree. While it is true that the conduct set forth in Lynn's complaint could be considered separate acts constituting separate offenses of, *inter alia*, assault, defamation and battery, Lynn has alleged, and we have found, that Robert's conduct *as a whole* states a cause of action for intentional infliction of emotional distress. Further, . . . there are "unjust results in the present case . . . which would militate in favor" of applying the

continuing tort rule in an action for intentional infliction of emotional distress.
*Id.* at 281 (emphasis in original) (internal quotation marks omitted) (quoting *Belleville Toyota*, 199 Ill. 2d at 347).

The *Feltmeier* court cited another Illinois case, *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 761 N.E.2d 175, 260 Ill. Dec. 331 (2001), apparently agreeing with *Pavlik*'s reasoning behind the application of the continuing tort doctrine to IIED claims:

> "Illinois courts have said that in many contexts, including employment, repetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones. It may be the pattern, course and accumulation of acts that make the conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be. It would be logically inconsistent to say that each act must be independently actionable while at the same time asserting that often it is the cumulative nature of the acts that give rise to the intentional infliction of emotional distress. Likewise, we cannot say that cumulative continuous acts may be required to constitute the tort but that prescription runs from the date of the first act. Because it is impossible to pinpoint the specific moment when enough conduct has occurred to become actionable, the termination of the conduct provides the most sensible place to begin the running of the prescriptive period."

*Id.* at 282 (citations omitted) (quoting *Pavlik*, 326 Ill. App. 3d at 745-46). The *Feltmeier* court aptly stated: "The purpose behind a statute of limitations is to prevent stale claims, not to preclude claims before they are ripe for adjudication, and certainly not to shield a wrongdoer." *Id.* at 283 (citations omitted).

In *Curtis v. Firth*, the Supreme Court of Idaho distinguished between wrongful acts and a continuing course of wrongful conduct. 123 Idaho 598, 603, 850 P.2d 749 (1993). The *Curtis* court stated that wrongful acts "are separate and wholly dissimilar . . . separate causes of action," such as assault, battery, or defamation, "and the statute of limitations begins to run from the time

17

of the commission of each wrongful act." *Id.* A continuing course of wrongful conduct, on the other hand, could constitute IIED. *Id.* The court further reasoned:

> As we have indicated previously, the definition of intentional infliction of emotional distress requires that there must be a causal connection between the wrongful conduct and the emotional distress, and the emotional distress must be severe. By its very nature this tort will often involve a series of acts over a period of time, rather than one single act causing severe emotional distress. For that reason we recognize the concept of continuing tort . . . should be extended to apply in other limited contexts, including particularly intentional infliction of emotional distress. We note, however, that embracing this concept in the area of intentional or negligent infliction of emotional distress does not throw open the doors to permit filing these actions at any time. The courts which have adopted this continuing tort theory have generally stated that the statute of limitations is only held in abeyance until the tortious acts cease.

*Id.* at 604 (citation omitted).

The Texas Court of Appeals articulated similar principles:

> In determining whether certain conduct is extreme and outrageous, courts consider the context and the relationship between the parties. Conduct considered extreme and outrageous in some relationships may not be so in other relationships. Married couples share an intensely personal and intimate relationship. When discord arises, it is inevitable that the parties will suffer emotional distress, often severe. . . .
>
> While occasional malicious and abusive incidents should not be condoned, they must often be tolerated in our society. When abusive conduct such as being assaulted, intimidated, and threatened becomes a regular pattern of behavior, it should not be accepted in a civilized society. In this case, Wife testified to continuous abusive behavior throughout the marriage. . . . Moreover, because intentional infliction of emotional distress is considered a "continuing tort," the defendant's conduct throughout the parties' marriage may be considered. When repeated or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous.

*Toles v. Toles*, 45 S.W.3d 252, 261-62 (Tex. Ct. App. 2001) (citations and footnote omitted).

Thus, other jurisdictions' treatment of IIED as a continuing tort, particularly in domestic violence contexts, suggests that Washington courts should consider the same.

4. The Washington Legislature Recognizes that Domestic Violence is a Problem

Also supporting our extension of the continuing tort doctrine to IIED claims involving domestic violence is the legislature's recognition that "[d]omestic violence is a problem of immense proportions" in Washington. RCW 7.105.900(3)(a). While Washington has not recognized a tort of domestic violence, the legislature has expressed the desire to address the issues that domestic violence poses. The legislature has found:

> Domestic violence is a problem of immense proportions. About 15 percent of Washington adults report experiencing domestic violence in their lifetime, and women, low-income people, and black and indigenous communities experience higher rates of domestic violence. When domestic violence victims seek to separate from their abuser, they face increased risks. Forty-five percent of domestic violence homicides occur within 90 days of a recent separation, while 75 percent occur within the first six months of separation. . . . Domestic violence has long been recognized as being at the core of other major social problems: Child abuse, other crimes of violence against persons or property, homelessness, and alcohol and drug abuse. Research has identified that adverse childhood experiences such as exposure to domestic violence have long-term negative impacts on health, well-being, and life outcomes, including criminal legal system involvement. Washington state studies have found that domestic violence is the most predictive of future violent crime by the perpetrator. . . . Domestic violence should not be minimized or dismissed based on any mental health diagnoses of the perpetrator or the victim. . . . The legislature finds that it is in the public interest to improve the lives of persons being victimized by the acts and dynamics of domestic violence, to require reasonable, coordinated measures to prevent domestic violence from occurring, and to respond effectively to secure the safety of survivors of domestic violence.

RCW 7.105.900(3)(a).

The legislature has defined "domestic violence" in part as "[p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; *coercive control*; unlawful harassment; or stalking of one intimate partner by another intimate partner." RCW 7.105.010(10)(a) (emphasis added). Notably, "coercive control" means:

19

> *a pattern of behavior* that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty. In determining whether the interference is unreasonable, *the court shall consider the context and impact of the pattern of behavior* from the perspective of a similarly situated person.

RCW 7.105.010(4)(a) (emphasis added). Thus, the legislature has clearly identified as a hallmark of domestic violence its *pattern of behavior*—or in other words, domestic violence is a continuing course of conduct.

The legislature included in its definition of coercive control an extensive, non-exclusive list of conduct, including: "[u]sing technology to threaten, humiliate, harass, stalk, intimidate, exert undue influence over, or abuse the other party"; communicating an intent to harm the other party's family members, including through physical violence; communicating an intent to "[c]ontact local or federal agencies based on actual or suspected immigration status"; "[e]xerting control over the other party's identity documents"; "[c]ausing dependence, confinement, or isolation of the other party from friends, relatives, or other sources of support"; and "[d]epriving the other party of basic necessities or committing other forms of financial exploitation." RCW 7.105.010(4)(a)(i)(B), (E)(IV), (F), (ii), (iii). Given the facts Vuth alleged in her complaint, assuming they are true, that Tavakoli exerted coercive control over Vuth is glaringly obvious.

Additionally, to better understand the effects of domestic violence, the legislature directed Washington's Gender and Justice Commission to "include in their 2022 work consideration of a study regarding how the inclusion of coercive control under chapter 268, Laws of 2022 helps to further realize the legislative intent of the law to increase safety for victims by obtaining effective legal protection apart from, or in addition to, the criminal legal system." RCW 7.105.903(1).

Furthermore, domestic violence is already considered as a continuous whole in criminal law. *See generally* RCW 9.94A.535(3)(h)(i) (allowing for an exceptional sentence in cases where domestic violence constitutes an ongoing pattern); *State v. Brush*, 5 Wn. App. 2d 40, 65, 425 P.3d 545 (2018) (stating that a domestic violence aggravator was appropriate because "the effect of any one act of abuse 'is more devastating when the victim has been routinely subjected to similar acts'" (quoting *State v. Duvall*, 86 Wn. App. 871, 877, 940 P.2d 671 (1997), *review denied*, 134 Wn.2d 1012 (1998))), *review denied*, 192 Wn.2d 1012 (2019).

Thus, based on legislature's recognition of domestic violence as an immense problem and that domestic violence is often a *pattern* of behavior or a *continuing course of conduct*, it is no big leap to extend the continuing tort doctrine to IIED claims involving domestic violence as it pertains to the statute of limitations. As the Supreme Court of Illinois stated in *Feltmeier*, "it would seem that the public policy of this state would be furthered by" such extension. 207 Ill. 2d at 271.

Based on Washington's approach to IIED claims, Washington's current application of the continuing tort doctrine, other jurisdictions' application of the continuing tort doctrine, and the Washington legislature's recognition of domestic violence as an immense problem, extending the continuing tort doctrine to IIED claims involving domestic violence comports both with the general principles behind IIED claims and the continuing tort doctrine, and would further Washington's public policy of improving the lives of victims of domestic violence. Thus, we hold that, as it pertains to the statute of limitations, the continuing tort doctrine applies to IIED claims involving acts of domestic violence that constitute a continuing course of conduct. We reverse the trial court's grant of partial summary judgment and remand for further proceedings consistent with this holding.

No. 60445-1-II

CONCLUSION

We hold that, as it pertains to the statute of limitations, the continuing tort doctrine applies to IIED claims involving acts of domestic violence that constitute a continuing course of conduct.[11] Accordingly, we reverse partial summary judgment limiting Vuth's claim to conduct occurring between May 31, 2020 and May 31, 2023, and remand for further proceedings consistent with this opinion.

_____
Le., J.

We concur:

_____
Price, A.C.J.

_____
Che, J.

---

[11] This opinion applies to IIED claims involving domestic violence and statutes of limitation only. As stated above, we take no position on whether IIED claims not involving domestic violence should be considered a continuous tort. Also, this opinion does not address other scenarios, endeavor to extend the continuing tort doctrine broadly, or opine on whether Vuth's claim will ultimately be successful.